**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**MATTHEW TRIPLETT,**

     **Plaintiff,**

**v.**                                       **Civil Action No. 2:13cv13
                                         (Judge Bailey)**

**WILLIAM M. FOX, Warden, St. Mary's
Correctional Center; VICKY GHEEN,
Administrator, Wexford Health; and
DR. PAUL GREGORY MODIE, JR.,**

     **Defendants.**

## REPORT AND RECOMMENDATION

### I.  Procedural History

On February 12, 2013, the *pro se* plaintiff initiated this civil rights action by filing a complaint pursuant to 42 U.S.C. §1983 against the named defendants, former employees of the St. Mary's Correctional Center ("SMCC"), in St. Mary's, West Virginia, or of Wexford Health Sources, Inc. ("Wexford"), who worked at SMCC. On February 13, 2013, the undersigned conducted a preliminary review of the file, determined that summary dismissal was not warranted, and ordered that a twenty-one day summons be issued for each of the defendants.  On March 5, 2013, the United States Marshal Service returned the summonses unexecuted on all three defendants. According to the unexecuted summons on defendants Fox and Modie, they have both retired from employment at SMCC. Service could not be effectuated on defendant Gheen, either, because she is now deceased.

By Order entered March 11, 2013 (Dkt.# 17),  the plaintiff was directed to provide updated addresses for defendants William M. Fox ("Fox") and Dr. Paul Gregory Modie, Jr. ("Modie"), in order that they might be served, and to provide the full name and address of the personal representative of the estate of defendant Gheen, so that that individual could be substituted for Gheen as a defendant in this action, and be served.   The plaintiff was given twenty-eight days, or until April 8, 2013, to do so.

That same day, plaintiff filed a letter motion seeking to amend his complaint by adding four new defendants, referencing the fact that the original three named defendants were unable to be located. By Order entered March 11, 2013 (Dkt.# 18), plaintiff's letter motion to amend was denied.

On March 19, 2013, plaintiff filed a Motion for Substitution, again seeking to amend his complaint by substituting three new defendants, and asking for the court's "desecration" in whether to also name the Regional Medical Director of Wexford as a defendant "because of his place in the corporate chain of command." (Dkt.# 21 at 2). By Order entered March 20, 2013 (Dkt.# 22), the plaintiff's second motion to amend his complaint was denied.

On April 1, 2013, the plaintiff filed a document titled "WVBOM - - Individual Licensee Public Record with History," providing a new address for Modie, with a hand-written note on it, saying "serve him if you can." (Dkt.# 24). Accordingly, on April 2, 2013, a Second Order to Answer was entered, directing that Modie be served. (Dkt.# 25).

On April 10, 2013, the plaintiff filed a "Letter of Inquiry" with the Court, seeking information on who the current defendants were. (Dkt.# 28). In response, the Clerk of Court mailed a copy of the docket sheet to the plaintiff.

On April 12, 2013, the summons for Modie was returned executed. (Dkt.# 29). On April 29, 2013, Modie filed a Motion to Dismiss. (Dkt.# 30). Because the plaintiff is proceeding *pro se,* a Roseboro Notice was issued on April 30, 2013. (Dkt.# 33). On May 17, 2013, the plaintiff filed his response. (Dkt.# 36). Modie filed a reply the same day. (Dkt.# 37). On June 5, 2013, the plaintiff filed a Motion for Correction of Original Submission. (Dkt.# 41). On July 22, 2013, the plaintiff filed Motion to Inform the Court of Existing Documentation in Support of Plaintiff's Case. (Dkt.# 48). On June 17, 2013, Modie filed a response to plaintiff's Motion for Correction of Original Submission. (Dkt.# 45). On August 27, 2013, the plaintiff filed a letter Motion to Amend the complaint. (Dkt.# 54). On September 6, 2013, the plaintiff filed a Motion for Status Hearing. (Dkt.# 57). On September 10, 2013, Modie filed a

Response to Plaintiff's Fourth Motion to Amend Complaint. (Dkt.# 58). On October 21, 2013, the plaintiff filed a document titled Screening Certificate of Merit. (Dkt.# 63). On October 29, 2013, Modie filed a Surreply Regarding the Response to Plaintiff's Fourth Motion to Amend Complaint. (Dkt.# 65) Plaintiff filed a Response to Defendant Paul Modie Jr. MD.'s Surreply Regarding the Response to Plaintiff's Fourth Motion to Amend Complaint, on November 12, 2013. (Dkt.# 66). On November 15, 2013, the plaintiff filed a Motion to Compel the Court. (Dkt.# 67).

Accordingly, this case is before the undersigned for a Report and Recommendation on the parties' motions.

## II. The Contentions of the Parties

### A. The Complaint

In the complaint, the plaintiff, an inmate at SMCC, raises medical malpractice claims and, liberally construed, an implied Eighth Amendment deliberate indifference to serious medical needs claim against Fox, the former Warden of the facility; Gheen, the former Administrator of Wexford Health Sources, Inc., the inmate health services provider at SMCC; and Modie, a physician who formerly worked for Wexford at SMCC.

The plaintiff alleges that Modie was negligent in providing medical care, because he inserted a needle into plaintiff's scrotum to aspirate fluid, leaving him with a severely swollen and painful scrotum. Plaintiff also alleges that both Gheen and Fox were negligent in their duty to provide adequate medical care to him, and that Fox was negligent for denying plaintiff's grievance over the issue. Plaintiff did not specify whether his claims were exhausted, although he attaches an exhausted grievance; some of his medical records; a copy of a West Virginia Board of Medicine Public Report of Licensee with History on defendant Modie; and a "Notice of Claim," notarized on September 4, 2012, addressed to SMCC, defendant Modie, and, despite not having named it as a defendant, "Wexford Health."

As relief, the plaintiff seeks "medical treatment and compesation [sic] for malpractice pain and suffering and mental anguish in the amount of One Million Dollars."

**B. Defendant Modie's Motion to Dismiss[1]**

In his motion to dismiss, Modie asserts that

1) this court lacks subject matter jurisdiction over plaintiff's medical malpractice claims, because plaintiff failed to serve the defendant with a pre-suit notice of his claims and a screening certificate of merit, as required by the West Virginia Medical Professional Liability Act ("MPLA") on the defendant; and

2) Plaintiff has failed to state sufficient facts to demonstrate an Eighth Amendment claim of deliberate indifference to serious medical needs; thus his complaint should be dismissed.

**C. Plaintiff's Response to Defendant Modie's Motion to Dismiss**

In his response, the plaintiff admits not filing the required pre-suit notice of claim and screening certificate of merit, but avers that his case falls under the exception to the MPLA because it is an "obviously serious illness." He asserts that his claim is really only one of medical malpractice, despite the defendant's motion to dismiss being "clouded with Eighth Amendment arguments." He contends that Modie should have referred him to a specialist "instead of filling him with pain killers," and that Modie "retaliated" against him by discontinuing his pain medication for filing a grievance against him, forcing him into "cold turkey" withdrawal. He asserts that he has exhausted his administrative remedies, attaching copies of medical records and grievances in support of his claims.

**D. Defendant Modie's Reply to Plaintiff's Response**

Modie reasserts his argument that the plaintiff fails to state a cognizable Eighth Amendment claim and that because of the plaintiff's failure to comply with the MPLA, the complaint should be dismissed because the court lacks subject matter jurisdiction. He avers that despite plaintiff's claim otherwise, plaintiff has not alleged malpractice so obvious that a lay juror could determine it occurred

---

[1] Each of Modie's pleadings filed in this action contains a caveat noting that the arguments advanced in them are also equally applicable to Gheen and Wexford Health Sources, Inc.; that Gheen and Wexford are willing to file similar motions when/if they are ever properly served; and that Modie requests that the Court dismiss the claims against all of the medical providers, based on the arguments contained therein.

without the assistance of expert testimony.  Further, he notes that plaintiff's medical records show that treatment was given, disproving any claim of deliberate indifference.

### E. Plaintiff's Motion for Correction of Original Submission

The plaintiff asserts that on May 29, 2013, he realized that he had mailed some Notices of Intent to the defendants, including Dr. Modie, at SMCC on September 11, 2012, by regular U.S., rather than certified mail, because it was cheaper.  He avers that none were returned as undeliverable but he is unsure if he mailed copies to the Court.[2]  He again reasserts his entitlement to the MPLA exception, relieving him of the obligation to provide a screening certificate of merit.  He attaches an undated copy of a Notice of Claim, addressed, not to any of the named defendants, but to SMCC, with a handwritten note at the bottom saying: "it was notarized. I had them in order to [sic].  Missing the first six pages now but I sent 5 original copies noterized [sic] to the court[3] with their___ [illegible]."[4]

### F. Plaintiff's Motion to Inform the Court of Existing Documentation in Support of Plaintiff's Case

Plaintiff requests that the court instruct him on what else he needs to provide to assert his claims. He reiterates his contentions regarding Modie's negligence and avers that he has "medical professionals that are willing to testify" in his case.[5]

### G. Defendant Modie's Response to Plaintiff's Motion for Correction of Original Submission

Defendant Modie repeats his argument that plaintiff's Notice of Claim does not meet the requirements of the MPLA, codified at W.Va. Code §55-7B-6(a) and his Motion for Correction of Original Submission should be denied as futile to the determination of the motion to dismiss.

---

[2] Plaintiff appears to have overlooked the September 4, 2012 notarized "Notice of Claim" attached to his complaint. It is unclear from the record if it was ever provided to the defendants prior to suit being filed.

[3] This statement contradicts plaintiff's earlier claim that he did not know if he sent copies to the Court.  The Notices of Claims, if sent to the Court in September, 2012, would have arrived approximately five months before plaintiff filed his original complaint on February 12, 2013, initiating this civil action.

[4] Dkt.# 41-1 at 1.

[5] Dkt.# 48 at 3.

## H. **Plaintiff's "Amended Complaint"**

Plaintiff's "amended complaint," filed on August 19, 2013, was first docketed as a complaint in a new civil action.[6]  Subsequently, on August 27, 2013, plaintiff wrote a letter to the Clerk of Court, advising that the complaint was not intended to be a new civil action, but rather an amended complaint in this action, asking that the Clerk close the new case and correct the docket.[7] Plaintiff's "amended complaint" appears to have been drafted by someone else on his behalf. It asserts additional medical negligence claims, now against an entirely new cohort of defendants, and for the first time, clearly asserts an Eighth Amendment claim of deliberate indifference to serious medical needs.  He attaches some of the same medical records already provided in the instant case; copies of some medical literature, and copies of several new grievances. As relief, he reiterates his request for one million dollars $1,000,000.00.

## I. **Defendant Modie's Response to Plaintiff's Fourth Motion to Amend Complaint**

Modie, contending that plaintiff's "amended complaint" was filed without a motion to amend, notes he is responding "out of an abundance of caution." He avers that the "amended complaint" does not have common defendants; is not based on the same set of facts; and alleges a separate and distinct cause of action against individuals who are not currently defendants in this case. Modie argues that the amended complaint must also be dismissed as futile, because, like the original complaint, plaintiff has not met the

---

[6] The complaint asserted claims only against Wexford Health Sources, Inc.; West Virginia Department of Corrections [sic]; Porfirio R. Pascasio, SR; Miguel Garcia, MD, and Lenora Teeney, RN; the defendants in the instant case, Fox, Gheen, and Modie, are not even included as defendants. Along with it, plaintiff filed an application to proceed *in forma pauperis*, a consent to collect fees from his trust account, and a copy of his Prison Trust Account Report with attached Ledger Sheets. Further, the complaint clearly stated that plaintiff had filed a "previous lawsuit" dealing with the same set of facts, identifying the "previous lawsuit" as the instant case. However, on the next page of the form complaint, in response to the inquiry about the disposition of the previous (instant) case, plaintiff wrote "PENDING[.]  This filing is supplemental pleading[.]" See Dkt.# 54 at 5 - 6.

[7] The letter was construed as a motion to withdraw the complaint in the new civil action. See 3:13cv94 (Dkt.# 12). By Order of Judge Groh, entered August 29, 2013, the new case was dismissed and stricken from the active docket; the new complaint was attached, along with the plaintiff's August 27, 2013 letter, to be filed as a motion to amend and a proposed amended complaint in the instant case (Dkt.# 54); and an earlier order granting IFP in that civil action was vacated.  See 3:13cv94, Dkt.# 13 at 1-2.

pre-suit requirements of the MPLA, nor stated facts sufficient to state a cognizable Eighth Amendment claim for deliberate indifference to serious medical needs.

**J.  Plaintiff's "Screening Certificate of Merit," (Response to Defendant Modie's Response to Plaintiff's Fourth Amended Complaint)**

Plaintiff filed a "Screening Certificate Of Merit," which on its face states was sent "VIA: SERTIFIED [sic]: MAIL: "In House Mail" to defendant Dr. Modie; however, the attached certificate of service states it was sent by regular U.S. mail to defendant Modie's counsel. The Screening Certificate of Merit was written by the plaintiff and generally reiterated his claims of negligence against the original named defendants.

**K.  Defendant Modie's Surreply Regarding the Response to Plaintiff's Fourth Motion to Amend Complaint**

Defendant Modie again reiterates his argument that the plaintiff's fourth motion to amend the complaint should be denied and the amended complaint dismissed as futile, because, like the original complaint, it does not meet the pre-suit requirements of the MPLA; state facts sufficient to state a cognizable Eighth Amendment claim for deliberate indifference to serious medical needs; and the "Screening Certificate of Merit" does not meet the requirements of W.Va. Code §55-7B-6.

**L.  Plaintiff's Response to Defendant Modie's Surreply Regarding the Response to Plaintiff's Fourth Motion to Amend the Complaint**

Plaintiff generally recites his difficulties in obtaining service on defendant Vicky Gheen ("Gheen"); avers that he is not "abanding [sic]" her as a defendant; and again requests to amend the complaint by serving the CEO of Wexford Health Sources with a copy of the complaint.  He requests an extension of time in which to continue trying to obtain information on the personal representative of defendant Gheen's estate.

## III. Standard of Review

**Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' "Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Conley, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," Id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

## IV. Analysis

Pursuant to Rule 8(a) of the Federal Rules of Civil Procedure, "[a] pleading which sets forth a claim for relief, whether an original claim, counter-claim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . . (2) a short and plain statement of the claim *showing that the pleader is entitled to relief*, and (3) a demand for judgment for the relief the pleader seeks." (Emphasis added). "And, although the pleading requirements of Rule 8(a) are very liberal, more detail often is required than the bald statement by plaintiff that he has a valid claim of some type against defendant." Migdal v. Rowe Price-Fleming International, Inc., 248 F.3d 321, 326 (4th Cir. 2001) (citation and internal quotations omitted).

Moreover, liability under §1983 is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001)(internal citation omitted). Therefore, in order to establish liability under §1983, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right under § 1983. Rizzo v. Good, 423 U.S. 362 (1976).

## A. Deliberate Indifference to Serious Medical Needs

Information gleaned from the medical records[8] attached to the plaintiff's various filings, indicates that the plaintiff suffers from: intestinal lymphangiectasia,[9] diagnosed by at least age three or four;[10] malabsorption syndrome since age 2;[11] a history of diarrhea with heme-positive stools;[12] a history of ascites;[13] hemorrhoids;[14] hypothyroidism;[15] asthma;[16] psychosis with depression and possible paranoid schizophrenia;[17] a high heart rate;[18] a possible right inguinal hernia;[19] is to follow a specialized diet to

---

[8] Among other things, the available records have at least a 13-month gap in them, between November 22, 2011 and January 29, 2013.

[9] Intestinal lymphangiectasia is a disorder, likely congenital, in which dilated intestinal lacteals (numerous minute intestinal lymph-carrying vessels) cause loss of lymph into the lumen of the small intestine, resulting in hypoproteinemia, hypogammaglobulinemia, hypoalbuminemia and reduced number of circulating lymphocytes or lymphopenia. The condition results in chronic protein loss, causing a number of systemic problems: generalized body swelling, including scrotal swelling; malabsorption and immune deficiency problems; pleural effusions; sometimes diarrhea with steatorrhea (fat in the stool) and sometimes iron deficient anemia. There may be occult or frank small intestinal bleeding, osteomalacia (inadequately-mineralized, "soft" bones) associated with vitamin D deficiency, and/or hypocalcemia, resulting in tetany. See: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3046182/

[10] Dkt.# 49-1 at 2.

[11] Dkt.# 1-1 at 15.

[12] Dkt.# 1-1 at 27.

[13] Dkt.# 1-1 at 19.

[14] Dkt.# 1-1 at 15.

[15] Dkt.# 36-4 at 5.

[16] Dkt.# 1-1 at 15.

[17] Dkt.# 1-1 at 15.

[18] Dkt.# 1-1 at 15.

[19] Dkt.# 1-1 at 5.

control his symptoms;[20] and takes numerous medications[21] including at least two anti-seizure medications.[22]

The available records indicate that plaintiff's first recorded complaint of a swollen right testicle occurred on July 13, 2011, when he submitted a Health Services Request form, was seen in triage by defendant Gheen, and advised to see the physician.[23] On July 18, 2011, he was seen by defendant Dr. Modie, who aspirated 130cc clear fluid from his scrotum; plaintiff apparently tolerated the procedure well.[24]

On August 29, 2011, plaintiff was brought to the SMCC infirmary after an apparent seizure; he was seen by Modie, who administered calcium gluconate (a calcium supplement given, *inter alia,* for situations like hypocalcemic tetany); Klonopin, an anti-seizure medication, and Lortab, a narcotic.[25] The accompanying nurse's note indicates that plaintiff had a bruise to the outer orbit of his right eye and complained of some right lower abdominal pain, related to a hernia.[26] Although not alleged in his original complaint, plaintiff later[27] alleged that on August 29, 2011, Dr. Modie did a second extraction of fluid from his right testicle. The August 29, 2011 records provided by the plaintiff do not reflect this.

The next complaint of right testicular problems reflected in plaintiff's medical records occurred on November 22, 2011, when plaintiff was emergently sent to St. Joseph Hospital, unable to urinate and

---

[20] Dkt.# at 25.

[21] Dkt.# 1-1 at 25.

[22] Dkt.# 1-1 at 5 and 8.
[23] Dkt.# 36-1 at 2.

[24] Dkt.# 1-1 at 5.

[25] Dkt.# 1-1 at 5.

[26] Dkt.# 1-1 at 5.

[27] Plaintiff raised this allegation in his July 22, 2013 Motion to Inform the Court of Existing Documentation in Support of Plaintiff's Case. Dkt.# 48 at 2-3.

with a swollen testicle;[28] an ultrasound was apparently performed to rule out a possible testicular torsion, and he was returned to SMCC for treatment.[29]

The next day, the plaintiff filed a grievance, complaining of right testicular pain and swelling; the grievance was ultimately denied. Defendant Gheen's November 27, 2011 response advised plaintiff that he had been treated at the hospital; an ultrasound was done; its findings and recommendations reported to him; and that the treatment he was receiving was the recommended treatment.[30]

There is a thirteen + month gap in the medical records provided. [31]

On January 29, 2013, plaintiff arrived at the Mount Olive Correctional Center in Mount Olive, West Virginia ("MCCC") as a transfer from Pruntytown Correctional Center in Grafton, West Virginia. He was admitted to the MCCC infirmary for treatment of pneumonia and a right testicular hydrocele[32] with cellulitis.[33]   On January 31, 2013, a progress note by a board-certified family nurse practitioner ("FNP-BC") indicates that plaintiff's right testicle was approximately ten times larger than the left; about the size of a softball; reddened, but not warm to touch. Plaintiff reported he had had the hydrocele for approximately two years; it had been drained previously; and that the antibiotic Rocephin had helped with the swelling and pain in his testicle in the past.  Rocephin was again prescribed. He was referred to a Dr. Shoaf, to be evaluated for the need for an ultrasound.[34]   On March 7, 2013, he complained of "lower

---

[28] Dkt.# 36-1 at 8.

[29] Dkt.# 36-1 at 5.

[30] Dkt.# 36-1 at 5.

[31] Dkt.# 36-4 at 6.

[32] A hydrocele is a collection of fluid in the scrotum. They can vary greatly in size and are usually painless, although large ones may cause discomfort. Most develop for no apparent reason, are harmless, and can be left alone. If needed, a small operation can usually cure the problem. See http://www.patient.co.uk/health/hydrocele-in-adults#

[33] Cellulitis is a common, non-contagious, potentially serious bacterial skin infection which appears as a swollen, red area of skin that feels hot and tender, and may spread rapidly.  See:
http://www.mayoclinic.com/health/cellulitis/DS00450

[34] Dkt.# 36-4 at 2.

stomach ache" and refused dinner. His right testicle was noted to be "extremely swollen."[35]  On March 9, 2013, the FNP-BC noted that plaintiff denied pain, had no change in scrotal size, that a "Collegial Review" had approved a right hydrocelectomy after reconsideration.  Plaintiff was notified of the decision.[36]

On March 22, 2013, the plaintiff was seen by a urologist, Joshua M. Lohri, D.O. of the Charleston Area Medical Center ("CAMC") Physicians Group Urology Center of Charleston, West Virginia and diagnosed with a recurrent hydrocele and orchialgia, or long-term testicular pain. A hydrocelectomy was recommended.[37]

Plaintiff remained in the MOCC infirmary until April 2, 2013, had laboratory blood work done; was treated with several courses of different antibiotics each for his pneumonia and right testicular cellulitis; had at least one chest x-ray; treatment with an albuterol inhaler; and nebulizer breathing treatments.  In his April 2, 2013 infirmary discharge summary, the urology recommendation for a hydrocelectomy was noted, as was an April 1, 2013 Wexford Health Sources "Collegial Review," opting to instead monitor and treat the hydrocele on site.[38]  It is unclear why the "Collegial Review" reconsideration of an apparently earlier denial of the hydrocelectomy mentioned in the March 9, 2013, note conflicts with this decision.

On April 9, 2013, the plaintiff filed a grievance complaining about the denial of surgery, his unbearable pain, repeated testicular infections, and his enlarged testicle, saying "RN Beth" had told him that they were "going to run my surgery process through again."  The grievance was accepted at the initial

---

[35] Dkt.# 36-4 at 6.

[36] Dkt.# 36-4 at 6.

[37] Dkt.# 36-4 at 4.

[38] Dkt.# 36-4 at 5.

level by his Unit Manager, who advised him that he would have surgery "very soon to address this problem," but it was later rejected for having excess pages.[39]

On April 16, 2013, the plaintiff underwent an outpatient right hydrocelectomy at CAMC. He was returned to the infirmary wearing a scrotal support; complaining of "ten out of ten" pain; received ice packs; pain medication; and post-operative care. Later that day he filed a grievance, complaining of not being provided a wheelchair upon arrival back at MOCC, and being forced to walk, shackled, after having surgery with general anesthesia. The grievance response indicated that CAMC did not recommend a wheelchair for him when he was discharged; he had not asked for one; and if he had, he would have been given one. The grievance was denied for excess pages.[40]

The following day, the records indicate that the plaintiff complained of severe right lower quadrant pain, but that his incision did not appear infected.[41] The medical records end there.

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991). A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment

---

[39] Dkt.# 54-2 at 6.

[40] Dkt.# 54-2 at 8.

[41] Dkt.# 36-4 at 11.

causes a life-long handicap or permanent loss. <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[42]

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. <u>Wilson</u>, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id</u>. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." <u>Id</u>. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical

---

[42] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. <u>Webb v. Prison Health Services</u>, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. <u>Veloz v. New York</u>, 35 F.Supp. 2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. <u>Brice v. Virginia Beach Correctional Center</u>, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. <u>Browning v. Snead</u>, 886 F. Supp. 547 (S.D. W.Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. <u>Finley v. Trent</u>, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. <u>Johnson v. Quinones</u>, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. <u>Clinkscales v. Pamlico Correctional Facility Med. Dep't.</u>, 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). Under the proper circumstances, a ventral hernia might be recognized as serious. <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159 (4th Cir. 2008).

attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

Here, with the exception of plaintiff's fourth "amended complaint," for which leave to file was not granted, plaintiff's filings deny that he is asserting an Eighth Amendment claim in favor of medical negligence claims. Nonetheless, while a *pro se* litigant's pleadings, no matter how unskillfully pled, are to be liberally construed,[43] a *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). To that end, the plaintiff's implied allegations that the defendants did not timely provide him with the desired treatment for his hydrocele will be liberally construed as attempting to state a claim of deliberate indifference. However, here, assuming *arguendo,* that plaintiff could establish that a hydrocele is a serious medical condition, satisfying the objective component of his Eighth Amendment claim, he cannot satisfy the subjective component of his Eighth Amendment claim, because there is no evidence that any of the named defendants, let alone any other WVDOC or Wexford medical staff treated him with deliberate indifference. The information supplied by the plaintiff indicates that he was seen at sick call each time he made a request. Furthermore, he was given treatment for a hydrocele, in the form of monitoring, supportive care and observation; needle aspiration(s) when indicated; emergency treatment at a hospital; testicular ultrasounds; prompt treatment with antibiotics when necessary; ice applications; elevation of his scrotum to reduce the swelling; pain medications; an outside referral to a urologist; and ultimately, hydrocelectomy, a surgical repair, permanently eliminating the recurrent problem. Plaintiff's contention that Modie "caused" his swollen painful testicle by performing the needle aspiration it overlooks the fact that Modie was draining it

---

[43] Noble v. Barnett, 24 F.3d 582, 587 n.6 (4th Cir. 1994).

*because* it was already swollen and painful, likely as a result of plaintiff's underlying medical problem with recurrent edema from intestinal lymphangiectasia.

It is clear from a reading of the plaintiff's many filings that the substance of his complaint is that he believes that the hydrocelectomy should have been performed sooner. However, so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. See Chance v. Armstrong, 143 F.3d 698, 703 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2ⁿᵈ Cir. 1986) and Estelle, 429 U.S. at 106. "The constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . ." "[T]he essential test is one of medical necessity and not simply of desirability." Dean, 804 F.2d at 215 (citations omitted) (alterations in original).  "[A]lthough it is plain that an inmate deserves *adequate* medical care, he cannot insist that his institutional host provide him with the most sophisticated care that money can buy.")  United States v. DeCologero, 821 F.2d 39, 42 (1ˢᵗ Cir. 1987)(emphasis in original).  Moreover, the medical care required by Estelle need not be the best possible care, it only has to be "reasonable" care. Vinnedge v. Gibbs, 550 f.2d 926 (4ᵗʰ Cir. 1977); see also Blanks v. Cunningham, 409 F.2d 220 (4ᵗʰ Cir. 1969); Edwards v. Duncan, 355 F.2d 993 (4ᵗʰ Cir. 1966). Inasmuch as there is no evidence that earlier removal of the hydrocele was necessary, or that the plaintiff was provided less than reasonable care, his Eighth Amendment Claim against the defendants should be dismissed.

**B.  Medical Negligence**

To the extent that the plaintiff is seeking to establish a medical negligence claim, he must comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider
> belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

17

W.Va. Code § 55-7B-3. When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code §55-7B-6. This section provides, in pertinent part:

### § 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) **At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider** the claimant will join in litigation. The notice of claim **shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit**. The screening certificate of merit shall be **executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted**. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

W.Va. Code § 55-7B-6 (emphasis added).

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp. 2d 805, 806-807 (N.D. W.Va. 2004).

With regard to the appropriate standard of care, plaintiff has completely failed to sustain his burden of proof. Plaintiff does not assert, much less establish, the standard of care for the diagnosis or

treatment of a hydrocele. Under the circumstances of this case, plaintiff would be required to produce the medical opinion of a qualified health care provider, not his own self-authored Screening Certificate of Merit, in order to raise any genuine issue of material fact with respect to the defendant(s)' breach of the duty of care. Moreover, there is nothing in the complaint which reveals that the plaintiff has met the other requirements of W.Va. Code §55-7B-6. Accordingly, even if this court has supplemental jurisdiction over the plaintiff's potential state law claims for medical malpractice, summary dismissal is appropriate.

## C. Defendant Fox and Gheen

In Kentucky v. Graham, the Supreme Court emphasized that official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent. Kentucky v. Graham, 473 U.S. 159, 165 (1985). A suit against a state official in her official capacity therefore should be treated as a suit against the State. Id. at 166. "[W]hen an official sued in this capacity in federal court dies or leaves office, her successor automatically assumes her role in the litigation." See Fed.Rule Civ.Pro. 25(d)(1) and Hafer v Melo, 502 U.S. 21, 25 (1991).

Here, because defendants Fox and Gheen, the remaining defendants to this action have been unavailable to service of process, if plaintiff had asserted individual capacity claims against them, they would have ultimately be dismissed for failure to effectuate service. However, a careful review of the plaintiff's complaint indicates that he has only asserted official capacity claims against them, Gheen because she allegedly "denied treatment as acting head of medical at facility," and Fox, because he "denied Grievance as Warden of facility." When a supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983 if the subordinate acted pursuant to an official policy or custom for which he is responsible, see Fisher v. Washington Metropolitan Area Transit Authority, 690 Fed 2nd 1113 (4th Cir. 1982); Orum v. Haynes, 68 F.Supp.2d 726 (N.D. W.Va. 1999), or the following elements are met: "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like

the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offense or practices,' and (3) there was an affirmative causal link between the supervisors inaction and the particular constitutional injuries suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994).

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm or constitutional injury." Id. "A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" Id.

Here, plaintiff has not provided any evidence that either Gheen or Fox tacitly authorized or was indifferent to an alleged violation of his constitutional rights, let alone that his constitutional rights were violated at all. Instead, it appears that Fox simply failed to grant the plaintiff relief he sought during the administrative remedy process. However, an administrator's participation in the administrative remedy process is not the type of personal involvement required to state a claim under § 1983. See Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003). Rather, such participation establishes, at best, that Fox acted in his official capacity as the Warden of the St. Mary's Correctional Center. Plaintiff's allegations against Gheen as the acting head of Wexford at SMCC, for denying him medical care have already proven to be without support, *supra*. In order for the governmental entity to be a proper party of interest, the entity's policy or custom must have played a part in the violation. Id. (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978)). In this case, the plaintiff fails to assert that a policy or custom of the entity played a part in the alleged violation of his constitutional rights.

Accordingly, the plaintiff cannot maintain this case against either defendant Fox or Gheen, and thus even if they or their successor in office had been served, they would have been dismissed from this action.

## IV.  Recommendation

For the foregoing reasons, the undersigned recommends that defendant Modie's Motion to Dismiss be **GRANTED** and the plaintiff's claims against the defendants be **DENIED and DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A, for the failure to state a claim for which relief may be granted.

Further, the undersigned recommends that the plaintiff's pending Motion to Amend the Complaint (Dkt.# 54);  and his Motions for Correction of Original Submission (Dkt.# 41); to Inform the Court of Existing Documentation in Support of Plaintiff's Case (Dkt.# 48); for Status Hearing (Dkt.# 57); and his Motion to Compel the Court (Dkt.# 67) all be **DENIED as moot.**

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, **or by December 2, 2013,** any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections.  A copy of any objections shall also be submitted to the United States District Judge.  **Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation**.   28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985);  United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

 The Clerk is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record electronically, as applicable.

DATED: November 25, 2013

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE